# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KRISTINE STRECKER,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 21-4514** |
| | : | |
| **LIVENT CORPORATION,** *et al*. | : | **FILED UNDER SEAL** |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

**TUCKER, J.**                                                                                    **June 28, 2022**

Presently before the Court is Livent Corporation, Gilberto Antoniazzi, and Marina Zivik's ("Defendants" or "Livent") Motion to Dismiss Complaint (ECF No. 7), Motion to Dismiss the Amended Complaint (ECF No. 10), Plaintiff Kristine Strecker's ("Plaintiff" or "Strecker") Response in Opposition (ECF No. 15), Defendants' Reply Brief (ECF No. 16), and Plaintiff's Surreply (ECF No. 19). Upon careful consideration of the Parties' submissions, and for the reasons outlined below, Defendants' Motion to Dismiss (ECF No. 7) is **DENIED** as **moot**[1]; however, Defendants' Motion to Dismiss the Amended Complaint (ECF No. 10) is **GRANTED**.

## I.       FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  The Parties

Livent Corporation sources, mines, transports, and sells lithium for various commercial and industrial applications, including batteries. Am. Compl. at ¶ 4. Livent is headquartered in Philadelphia, where Plaintiff worked, but has operations throughout the world, including in

---

[1] On January 26, 2022, Plaintiff filed an Amended Complaint.

[2] This section primarily from Plaintiff's Amended Complaint ("Am. Compl."), Defendants' Second Motion ("Defs.' Br."), and Plaintiff's Response Brief ("Resp.").

China. Defs.' Br. at 2. Livent was initially a part of FMC Corporation but, in 2018, went off on its own, which led to it making an Initial Public Offering ("IPO") of shares in October of that same year. *Id*. at 2-3.

Plaintiff, a 57-year-old woman, was first diagnosed with Fibromyalgia in 2008. Am. Compl. at ¶¶ 10-11. Significant stress triggers Strecker's Fibromyalgia flare-ups, which cause her to suffer from widespread musculoskeletal pain accompanied by fatigue, sleep, memory loss, and mood issues. *Id*.

On or about March 29, 2019, Defendant extended Strecker[3] an offer to join Livent as a Senior Manager in Transfer Pricing, where Defendant Gilberto Antoniazzi ("Antoniazzi"), the Chief Financial Officer ("CFO"), would be her immediate supervisor. Am. Compl. at ¶¶ 5-6, 20; *see also* Ex. I of Am. Compl. Plaintiff accepted the offer on April 1st and started on April 29th. Resp. at 3.

A few months later, however, Livent changed this hierarchy when it hired Defendant Marina Zivik ("Zivik") on June 4, 2019, to the position of Head of Global Tax. Am. Compl. at ¶ 23. Following her hire, Zivik became Strecker's immediate supervisor and Zivik would in turn report to Antoniazzi.[4] *Id*.

### B. Livent's Contract and Strecker's Assignment

In early May of 2019, Antoniazzi gave Strecker her first task, directing her to: (1) analyze Livent's pricing arrangements in and out of China to identify issues contributing to substantial ongoing losses there; and (2) recommend changes to reduce losses and increase revenue. Am.

---

[3] Prior to joining Livent, Plaintiff worked in senior transfer pricing management and international transfer pricing and tax consulting roles for global manufacturing companies and a prominent international consulting firm. Am. Compl. at ¶ 21.

[4] Plaintiff alleges that she thought this new reporting arrangement was unusual because, in her experience, senior transfer pricing managers generally report to a company's CFOs.

Compl. at ¶ 22. To complete this task, Strecker worked with various Livent employees and outside consultants, and reviewed all contracts held by Livent and its affiliates for the purchase and sale of raw lithium and finished lithium products in and out of the Chinese markets. *Id*. at ¶¶ 22, 24.

One contract that Livent held and operated under in China was known as the "SWAP Agreement." Am. Compl. at ¶ 25. This contract dictated that Livent agreed to sell finished lithium products in Germany to Albermarle, a German competitor, in exchange for the right to purchase additional raw lithium material from Albermarle in China for processing in its own Chinese plant. *Id*. The SWAP agreement was allegedly entered into by FMC Corporation in 2017, prior to Livent's spinoff and IPO. *Id*. at ¶ 26. Strecker alleges that Livent was selling unprocessed, mined lithium in the Chinese market from its own leased mining operations in Argentina and purchasing substantial amounts of unprocessed raw lithium in China from Albermarle, pursuant to the SWAP Agreement, at significantly higher rates which exceeded the market prices for processed lithium. *Id*. at ¶ 27. These transactions caused the cost of raw materials to far exceed the final sales price for processed lithium and contributed to significant losses for Livent in the Chinese market. *Id*.

In mid-June of 2019, Strecker completed her assessment and recommended Livent either: (1) do away completely with the SWAP Agreement as it costed Defendant a significant amount of money; or (2) restructure the transactions to reduce losses and maximize revenues in the Chinese market. Am. Compl. at ¶ 28. Plaintiff provided her report to outside consultants, Ernst & Young ("E&Y"), who concurred with her analysis and recommendation, before she submitted it to Zivik. *Id*.

### C. Class-Action Lawsuits

Unbeknownst to Strecker, there were three class action lawsuits filed against Livent FMC and other defendants in both Pennsylvania federal and state courts. Am. Compl. at ¶ 73. These suits centered on alleged securities fraud claims in connection with Livent's October 2018 IPO. *Id.* The class actions alleged misrepresentations in the offering prospectus and subsequent communications concerning Livent's October 2018 IPO. *Id.* at ¶ 74. The alleged misrepresentations concerned statements regarding Livent's beneficial contractual pricing arrangements in and out of China for the sale and purchase of lithium and related components or byproducts. *Id.* at ¶¶ 74-75.

These actions were filed approximately two weeks after Strecker received her assignment from Antoniazzi. Am. Compl. at ¶ 73.

### D. Alleged Discriminatory and Retaliatory Actions

Zivik and Strecker set up a meeting on June 21, 2019 to discuss Plaintiff's findings. Am. Compl. at ¶ 31. Zivik worked remotely that day and called into the meeting with Strecker and, then-Executive Director of International Tax – Transfer Pricing for E&Y, Olga Manziy ("Manziy"). *Id.* Strecker presented her analysis and recommendations and, although it was well received by Manziy, Zivik deflected questions concerning the transfer pricing in China, including the SWAP Agreement. *Id.* at ¶ 32. Plaintiff sought feedback from Zivik but she was unresponsive. *Id.* at ¶ 33. Strecker also spoke with Livent's U.S. Controller, Emanuela Viana, regarding the contractual relationships in China and the SWAP Agreement. *Id.* at ¶ 34.

One week after Strecker presented her findings, Zivik began to harass her. Am. Compl. at ¶ 36. First, Zivik stopped communicating with Strecker and became critical of her work in group meetings. *Id.* Second, Zivik began to bypass Strecker and communicated directly with one of her

subordinate, Tyshon Tucker ("Tucker"). This alarmed Plaintiff because Zivik did not include her on critical issues that were her responsibility a Senior Manager of Transfer Pricing. *Id.* Third, Zivik began to berate her. *Id.* at ¶ 37.

On July 11, 2019, on one such occasion, Zivik summoned Plaintiff into her office and began to scold her about missing meetings earlier in the week. Strecker alleges she was not asked to participate in one of the meetings and Tucker led the other group presentation. Am. Compl. at ¶ 37. Plaintiff admits she did not attend the meeting in which Tucker led the presentation due to her Fibromyalgia flare-ups caused by Zivik's treatment of her. *Id.* at ¶ 38. On July 12, Strecker wrote Zivik an email where she requested explanations regarding decisions concerning work roles and assignments that were in place before Zivik's arrival. *Id.* at ¶ 39 She also asked her to provide input as to Strecker's role and defined work objectives moving forward; Zivik never provided the requested input. *Id.*

On July 16, 2019, Alicia Markmann ("Markmann"), Chief Human Resources Officer, asked to meet with Strecker because Zivik reported that she felt Strecker was not interested in her job; Plaintiff disputed this claim and blamed Zivik. Am. Compl. at 40. Strecker informed Markmann that she suffered from fibromyalgia, and it flared up because of the pressure Zivik placed on her. *Id.* Markmann responded that Plaintiff "had to find a way to get along" with Zivik and invited her to request a reasonable accommodation for her disability. *Id.*

Shortly after the meeting, Zivik sent Plaintiff a hostile email that criticized her work.[5] Am. Compl. at ¶ 41. Strecker responded and voiced her concern, confusion about her treatment, and advised that her fibromyalgia was flaring up which required her to go home. *Id.* That same evening, Strecker filed a complaint with Defendant's Ethics Office wherein she described

---

[5] Zivik had found tac calculations errors in a report by a colleague which she attributed to Plaintiff for failing to review it. Am. Compl. ¶ 41.

Zivik's treatment as "unfair [and] harassing" and its effects on her disability.[6] *Id*. at 43; *see also* Ex. C of Am. Compl. Plaintiff requested an accommodation in the form of a reporting reassignment to another manager or, preferably resume reporting to Antoniazzi. Am. Comp. at ¶ 43-44. Strecker also expressed fear of retaliation from Zivik, which allegedly occurred in four specific instances.

The first happened on July 19, 2019, when Zivik refused to allow Strecker to implant a pricing agreement with a Livent-affiliated Chinese company and refused to provide an explanation for her response. Am. Compl. at ¶ 45. Concerned, Plaintiff submitted a second complaint to the Ethics Office on July 22nd, alleging Zivik lacked knowledge about transfer pricing and complained about Zivik's comments to the HR department regarding Strecker's interest and dedication to her job. *Id*. at ¶ 46; *see also* Ex. D. of Am. Compl. The Ethics Office subsequently: (1) rejected Strecker's request; (2) refused to propose an alternative accommodation; and (3) did not engage in an interactive dialogue. Am. Compl. at ¶ 47.

The second happened on July 24, 2019. Zivik continued her alleged retaliation campaign when she excluded Strecker from a meeting that she believed was within her area of responsibility. Am. Compl. at ¶ 48. Strecker was initially scheduled to participate in a "Tax Summit" meeting at 11:00 a.m. but received an email from Zivik fifteen minutes prior to it, stating that the meeting was canceled. *Id*. Twenty minutes later, after noticing that none of her colleagues were at their desks, Strecker went to the room where the meeting was being held, only to find Zivik and her colleagues. *Id*.

---

[6] Plaintiff's Amended Complaint alleges that the email detailed Strecker's concern that Zivik wished to hire her former co-worker, a desire that Zivik allegedly expressed in earlier group meetings but was unable to do so because of the budget; thus, she needed to fire Strecker or have her quit. Am. Compl. at ¶ 43.

A third instance occurred when Strecker discovered, on July 29, that she was excluded from another meeting. Am. Compl. at ¶ 50. When she asked other invitees why she was excluded, she never received a response. *Id*. at ¶51.

The fourth and final instance eventually led to Strecker being placed on leave. Am. Compl. at ¶¶ 52-58. On July 30, 2019, Zivik emailed Strecker and Tucker asking them to review and provide input on a 2018 pricing document for Livent China. *Id*. at ¶ 52. Attached to that email was an ongoing email thread concerning transfer pricing in China, from which Strecker had been excluded since June 28, 2019[7]. *Id*. Plaintiff forwarded the email to the E&Y transfer pricing team, asked to be included on all future emails and forwarded the same correspondence to Livent's Ethics Office Assistant General Counsel, Mihir Munshi. *Id*. at 54.

Within minutes of sending both emails, Defendants terminated Strecker's access to their network and email systems and disabled her company laptop. Am. Compl. at ¶ 55. This action "convinced" Plaintiff that Defendants sought to terminate her employment because she was unable to carry out her job duties and continue working; the associated stress from this situation exacerbated her fibromyalgia. *Id*. at ¶¶ 56-57.

### E. Strecker Leaving and Her Filing of Administrative Actions

After her network access was denied, Strecker met with Markmann. Am. Compl. at ¶ 58. Plaintiff provided Markmann with a doctor's note and left work to take a medical leave of absence. *Id*. Aside from one meeting on August 1 that was previously scheduled, Plaintiff never returned to work for Livent. *Id*. at ¶ 59.

---

[7] Plaintiff alleges that the email correspondence from which she was excluded concerned the preparation of a summary financial report on Livent China for the 2019 fiscal year by its transfer pricing consultants at E&Y, and the "client" decision to attribute operating losses to China to "market conditions" without disclosing intercompany buy-sell agreements or financial results by sector.

7

On August 5, 2019, while still out of the office and away from her personal email, Strecker forwarded her report on transfer pricing to China to Antoniazzi, copying Markmann because she feared that Zivik never forwarded the report to him and instead falsely claimed Strecker never completed it. Am. Compl. at ¶ 61. That evening, Antoniazzi responded to Strecker's email and informed her that she violated Livent's Acceptable Use of IT Resources Policy. *Id*. at 62. The next day, after going on sick leave and applying for Short Term Disability ("STD"), Markmann accused Strecker of removing Livent confidential information in violation of company policy. *Id*. at ¶ 63.

On August 9, Markmann informed Strecker that after Mihir's IT investigation, Defendants determined that she violated their confidentiality policy. Am. Comp. at ¶ 64. Markmann told her that Livent would not fire her for stealing business emails if she signed an attached proposed severance agreement. *Id*. Plaintiff refused. *Id*. Instead, Strecker informed Markmann on August 16 that she would be unable to work at Livent until a determination of her STD benefits were made. *Id*. During this time, Plaintiff retained an attorney who advised her that Livent was obligated to pay her salary for six months under its disability policy. *Id*. at ¶ 66.

Livent continued to pay Strecker through October 2019. Am. Compl. at ¶ 67. Separately, Livent's insurance carrier denied Strecker's application for STD benefits on October 22, 2019, which Plaintiff appealed.[8] *Id*. at ¶¶ 67-68. On October 23, following the denial of her benefits, Markmann emailed Plaintiff and informed her that Livent denied her claims of harassment, reasserted its allegations of confidentiality violations, and supported Zivik's performance criticisms. *Id*. at ¶ 67. More importantly, Markmann advised that Strecker would be paid through October 31, and the company would effectively terminate her employment on November 1. *Id*.

---

[8] The Court is unaware of the outcome of that appeal.

Plaintiff's then-counsel reached out to Livent's counsel and convinced them to not terminate Strecker's employment on November 1, as scheduled. *Id.* at ¶ 68. Livent stopped paying her salary in November 2019 but resumed paying from December 2019 through February 2020. *Id.* at ¶ 69. Strecker also maintained her health insurance benefits without interruption. *Id.* As this occurred, Livent placed a recruitment advertisement in October 2019 for a transfer pricing executive to take on Strecker's duties and hired such an executive a month or so later. *Id.* at ¶ 70.

In March 2020, Strecker did not receive her monthly salary and asked her then counsel to inquire as to its status. Am. Compl. at ¶ 71. On April 12, 2020, Livent's Counsel demanded Plaintiff return all payments from December 2019 through February 2020 or face legal action; Strecker's counsel resigned that same day. *Id.* at ¶ 72.

Plaintiff retained current counsel in July 2020. Am. Compl. at ¶ 73. Current counsel discovered the class action lawsuits and contacted Livent's counsel on November 27, 2020. *Id.* at ¶¶ 73-76. Livent's counsel communicated in December 2020 and January 2021 and proposed that Plaintiff consider a separation agreement where her employment would be terminated in exchange for a release and a retainer of what Plaintiff believed to be disability payments made from December 2019 through February 2020. *Id.* at ¶ 76.

On September 25, 2020, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that Livent terminated her in violation of the Americans with Disabilities Act ("ADA"). Am. Compl. at ¶ 13. Additionally, on March 24, 2021, she filed a Sarbanes-Oxley Act ("SOX") complaint with the Occupational Safety and Health Administration ("OSHA"), where she claimed she had engaged in protected activity under SOX because of an internal report that she submitted to her supervisor about the SWAP Agreement. *Id.* at ¶ 16. She did not name Antoniazzi in her OSHA complaint.

### F. Plaintiff's Complaints and Allegations

On October 14, 2021, Plaintiff filed her initial Complaint which Defendants moved to dismiss on December 23, 2021. Strecker filed an Amended Complaint on January 6, 2022. ECF No. 9. Plaintiff brings four counts alleging: (1) Livent violated the ADA, 18 U.S.C. § 12101, *et seq.*, when it terminated her; (2) Livent violated the ADA when it failed to engage in interactive dialogue regarding a reasonable accommodation for her; (3) Livent violated the ADA when it and its employee's retaliated against her for filing multiple ethics complaints; and (4) Defendants Livent, Antoniazzi, and Zivik violated the SOX's whistleblower retaliation provisions, 18 U.S.C. § 1514A(a). *See* Am. Compl.

Defendants renews their Motion to Dismiss Strecker's Amended Complaint. Defendants contend that Plaintiff's ADA claims should be dismissed because: (1) Plaintiff initiated her charge of discrimination outside of the statute of limitations; (2) even if her charge had been timely filed, her Complaint fails to state a claim because she did not request a reasonable accommodation; (3) she did not suffer an adverse employment action; and (4) she failed to state a claim for retaliation under the ADA.

As to Plaintiff's SOX claims, Defendants argues Strecker does not allege that she provided information that she reasonably believed constituted a violation of: (1) any rule or regulation of the Securities and Exchange Commission ("SEC"); or (2) a provision of federal law relating to fraud against shareholders to a person with supervisory authority over her, as required by § 1514A(a)(1). Defs.' Br. at 2. Additionally, Defendants contends Strecker did not file her administrative complaint with OSHA within the statute of limitations as required by SOX, and her OSHA complaint did not provide fair notice of her claims against Antoniazzi. *Id.*

This Court agrees with Defendants and dismisses Plaintiff's Amended Complaint with Prejudice.

## II.      STANDARD OF REVIEW

A Rule 12(b)(6) Motion to Dismiss seeks to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The touchstone of that pleading standard is plausibility. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and quotations omitted). Facial plausibility requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*. A plaintiff will not prevail if he provides only "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). Instead, the plaintiff must detail "enough facts to raise a reasonable expectation that discovery will reveal evidence of 'each necessary element of the claims alleged in the complaint.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556 (2007)).

The Third Circuit set forth a three-part test that district courts must apply when evaluating whether allegations survive a 12(b)(6) motion to dismiss. *Santiago v. Warminster Township*, 629 F.3d 121 (3d Cir. 2010). A court must: (1) identify the elements of the claim; (2) review the complaint to strike conclusory allegations; and (3) look at the well-pleaded components of the complaint and evaluate "whether all the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). If the complaint fails to do so, the motion to dismiss will be granted.

## III.    DISCUSSION

### A.  Plaintiff's ADA Claims

Defendants' Motion argues Strecker's ADA claims fail because: (1) she untimely filed a Charge with the EEOC; (2) she is not a qualified person under the ADA; (3) she abandoned her employment with Livent; and (4) she cannot plead a causal connection between her request for an accommodation and the cessation of her employment. Defs.' Br. at 9-10.

Plaintiff failed to timely file her Charge with the EEOC; thus, her ADA claims must be dismissed on these grounds alone. However, for purposes of thoroughness, this Court also addresses whether she is a qualified person.

### 1.  Statute of Limitations

"Plaintiffs must exhaust their administrative remedies before filing an ADA claim in federal court." *Simko v. U.S. Steel Corp.*, 992 F.3d 198 (3d Cir. 2021) (citing *Churchill v. Star Enters.*, 183 F. 3d 184, 190 (3d Cir. 1990)); 42 U.S.C. §§ 12117(a), 2000e-5. The ADA further requires that a plaintiff file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 12117 (provides that the same procedures used to enforce Title VII of the Civil Rights Act of 1964 apply to ADA claims); *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). "Once a charge of some sort is filed with the EEOC, . . . the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . .'" *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) (citations omitted).

Generally, the exhaustion requirement is "strictly construed and the failure to pursue the appropriate administrative remedies will bar judicial review." *Elberson v. Pa.*, 396 F. App' x

821, 822 (3d Cir. 2010). "Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving that the plaintiff has failed to exhaust administrative remedies." *Williams v. Runyan*, 130 F.3d 568, 573 (3d Cir. 1997). Moreover, "[e]quitable tolling stops the statute of limitations from running when [a] charge's accrual date has already passed." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 384 (3d Cir. 2007). It is a remedy "available only sparingly and in extraordinary situations." *Robinson v. Dalton*, 107 F.3d 1018, 1023 (3d Cir. 1997).

Strecker filed a Charge of Discrimination with the EEOC on September 25, 2020. Defendants argue that under *Bonham v. Dresser Indus.*, Plaintiff was required to have filed an administrative complaint within 300 days of "unequivocal notice of termination." 569 F.2d 187, 191 (3d Cir. 1977). Defendants assert that Strecker's first unequivocal notice of termination occurred when she abandoned her position in August 2019. Defs.' Br. at 11. She never returned to work, Livent offered her a severance package in August, and again in October, and Defendants replaced her in November 2019, when they initially stopped paying her. Moreover, Defendants contend that Plaintiff cannot point to any adverse action that occurred after November 30, 2019 to justify her filing her Charge on September 25, 2020.

Plaintiff argues that she never received an unequivocal notice of termination and remains employed by Livent. Plaintiff's Reply at 14. She also contends she did not leave work because she was terminated; instead, she left on sick leave and to apply for disability benefits. *Id*. She also maintained her health insurance benefits throughout this period. *Id*. at 14-15. Only after Livent demanded repayment and threatened suit on April 17, 2020, did Plaintiff "realize she was

never going to be permitted to return to work at Livent" and proceeded to file her Complaint on September 25, 2020.

This Court finds that Defendant met their burden of proof and Plaintiff's arguments fail. Under federal law, a plaintiff is terminated from employment when he or she receives "final, unequivocal, and definite" notice of their termination, even if the effective date occurs later. *Del. State College v. Ricks*, 449 U.S. 250, 259 (1980); *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (to determine the moment of discharge, "the proper focus is on the time of the discriminatory act, not the point at which the consequences become painful").

Here, on October 23, 2019, Livent advised Plaintiff that she was effectively terminated on November 1, 2019 and included a severance agreement in their correspondence. Am. Compl. at ¶ 67. Plaintiff was aware that Livent planned to terminate her, as evidenced by her then-attorney trying to convince Livent not to terminate Strecker's employment "November 1st *as scheduled*." *Id.* at ¶ 68. A reasonable person would not believe, as Plaintiff alleges, that she was still employed until Defendant demanded repayment and threatened suit on April 17, 2020, particularly because she did not work a single day since August and her STD benefits were denied.

Moreover, Plaintiff cannot argue she reasonably believed she still worked at Livent when: (1) she knew Defendants advertised her prior position in October 2019; (2) informed her she would be terminated; and (3) hired a replacement in November 2019, when Livent in fact terminated her. Am. Compl. at ¶ 70. Thus, Plaintiff received an unequivocal notice of

14

termination on October 22, 2019 but failed to file her EEOC Charge until September 2020, exceeding the 300-day statute of limitations.

### 2. A Qualified Person Under the ADA

Even if this Court were to accept that Plaintiff timely filed a Charge with the EEOC, her ADA claims still fail.

To establish a *prima facie* case of discrimination under the ADA, a plaintiff needs to allege: (1) he or she is disabled within the meaning of the ADA; (2) otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) he or she suffered an adverse employment consequence as a result of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). Within the ADA's definition of "disability" is "being regarded as having such an impairment." 42 U.S.C. § 121012(1)(C).

Although the ADA does not define "reasonable accommodation," the implementing regulations provide that it encompasses those modifications to the work environment or to the manner under which duties are carried out "that enable an individual with a disability to perform the essential functions of that position" or otherwise place the individual on an equal footing with his coworkers. 29 C.F.R. § 1630.2(o)(1)(ii)-(iii) (2012). Examples of a reasonable accommodation may include modification of a work schedule and reassignment to a vacant position. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii).

The employer's duty to accommodate arises only where the employee requires an accommodation in order to be able to perform the essential functions of his job. *Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013) (citing 42 U.S.C. §§ 12111(9), 12112(b)). In other words, "an employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job — not because such

an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place." *Id.*

Strecker's disability did not affect her ability do her job. Strecker effectively completed the report and analysis that her initial supervisor assigned to her. She, however, was unable to effectively work with Zivik. Plaintiff alleges she "requested a reasonable accommodation in the form of a reassignment to another manager." Am. Compl. at ¶ 40. Her requests were based in part on the stress she experienced under Zivik's constant criticism of her. However, as Defendants correctly cite, the Third Circuit has held that transferring individuals away from those who caused them prolonged and inordinate stress is unreasonable as a matter of law. *See*, *e.g.*, *Gaul v. Lucent Technologies Inc.*, 134 F.3d 576, 580 (3d Cir. 1998); *Kendrell v. Sec'y United States DOD*, 851 F. App' x 317, 320-21 (3d Cir. 2021); *Taylor v. Phoenixville Sch. Dis.*, 184 F.3d 296, 319 n.10 (3d Cir. 1999) (noting "that a disabled employee is not entitled to a supervisor ideally suited to his or her needs" and reiterating the Third Circuit's holding in *Gaul* "that an employee is not entitled to transfer whenever the employee deems that his co-workers are causing him…stress."). Consequently, Plaintiff failed to establish an essential element for her *prima facia* case of discrimination[9]; thus, Counts I, II and III of Plaintiff's ADA claims are dismissed.

### B.  Plaintiff's SOX Claims

Defendants argue Strecker's Amended Complaint fails to state a *prima facie* case of SOX retaliation because: (1) she did not assert that she engaged in activity protected under SOX; and

---

[9] Plaintiff also argues that Defendants failed to participate in the "interactive process" of finding a reasonable accommodation. Plaintiff pled that she requested a single accommodation, which, as stated above, is unreasonable as a matter of law. The Third Circuit has held that such an employee "will be at fault for the breakdown in the interactive process." *Taylor*, 184, F.3d at 316 n.7. Thus, this argument must also fail.

(2) she did not file a complaint with OSHA within the 180-day statute of limitations. Defs.' Br. at 16.

Section 806 of SOX prohibits publicly traded companies and their employees from retaliating against an employee who:

> provide[s] information, cause[s] information to be provided, or otherwise assist[s] in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341[mail fraud], 1343 [wire, radio, or television fraud], 1344 [bank fraud], or 1348 [securities and commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information is provided to or the investigation is conducted by . . . a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514A.

"To establish a *prima facie* case for a Section 806 claim, the employee must allege that he or she (1) 'engaged in a protected activity;' (2) '[t]he respondent knew or suspected that the employee engaged in the protected activity;' (3) '[t]he employee suffered an adverse action;' and (4) '[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action.'" *Wiest v. Lynch*, 710 F.3d 121, 129 (3d Cir. 2013) (quoting 29 C.F.R. § 1980.104(e)(2)(i)-(iv)).

"An employee's activity is 'protected' when the employee believes 'that the conduct that is the subject of his communication relates to an existing or prospective violation of one of the federal laws referenced in [Section] 806'" *Wickens v. Rite Aid Hdqtrs Corp.*, No. 19-2021, 2021 WL 1375360, at *5 (M.D. Pa. Apr. 12, 2021) (citing *Reilly v. GlaxoSmithKline, LLC*, 820 F. App' x 93, 96 (3d Cir. 2020)). "The employee's belief must be both subjectively in good faith and objectively reasonable. *Id* (citing *Wiest*, 710 F.3d at 134). "A belief is objectively reasonable

when a reasonable person with the same training and experience as the employee would believe that the conduct implicated in the employee's communication could rise to the level of a violation of one of the enumerated provisions in Section 806." *Id.*

Additionally, under Section 806 of SOX, a publicly traded company, officer, or employee may not "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee" if the individual provides information or assists in the investigation regarding any conduct that violates any of the enumerated provisions. *Wickens*, 2021 WL 1375360, at *4. Such provisions include Sections: (1) 1341, mail fraud; (2) 1343, wire fraud; (3) 1344, bank fraud; or (4) 1348, securities fraud. *Id.* Section 806 also extends to "any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders…" *Id.* Finally, such an individual must also inform or assist in an investigation conducted by: "(1) a federal regulatory or law enforcement agency; (2) any member of Congress or any committee of Congress; or (3) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate discover, or terminate misconduct)[.]" *Id.* (citing 18 U.S.C. § 1514A).

"Section 806 provides that an employee alleging discrimination in violation of SOX may file a complaint with the Secretary of Labor, who may issue a final order." *Wiest*, 710 F.3d at 129 (citing 18 U.S.C. § 1514A(b)(1)(A), (2) (incorporating the Department of Labor complaint procedures under 49 U.S.C. § 42121(b))). "If the Secretary fails to issue a final decision within 180 days of the filing of the complaint, the complainant may also file a civil action in federal district court." *Id.* § 1514A(b)(1)(B). "The Secretary of Labor has delegated the authority to review appeals under Section 806 and issue final agency decisions to the [Administrative Review

Board].” *Id.* (citing Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 75 Fed. Reg. 3924, 3924-25 (Jan. 25, 2010)).

Here, Plaintiff failed to make a report that constituted a protected activity. Strecker pleads that she reported Livent was “purchasing additional unprocessed lithium materials from a third-party supplier at above market rates for processed lithium…” that resulted in significant loss for Livent in the Chinese market. Am. Compl. at ¶ 31. First, such a report did not allege mail fraud, wire fraud, bank fraud, or securities fraud as required under the statute. This Court agrees with Defendants and finds Plaintiff’s allegations may fall under the umbrella of anti-competitive behaviors. Although Plaintiff may have objectively and subjectively believed that what she was reporting some sort of fraud, when it may have been a bad contract, Strecker has not reported particular or specific violation of laws identified in SOX. Instead, she alleged concerns about the contracts, losses, and their financial impact on the Chinese market. Am. Compl. at ¶ 133.

Second, Defendants were aware that they were losing money on the SWAP contracts as evidenced by Strecker’s assignment. Am. Compl. at ¶ 22. Defendants initially wanted Plaintiff to analyze why Livent was losing substantial money in the Chinese markets and make recommendations, which she did. *Id.* Plaintiff may not turn around and allege a whistleblower violation when her supervisory directed her to make the investigation to begin with.

Finally, Plaintiff did not submit a specific report alleging violations of enumerated laws as required by the statute. Rather, Plaintiff informed her direct supervisor that she had “great concern” about reporting what she thought was anti-competitive behavior. Again, this is not enough. As Defendant accurately states, having an unspoken concern does not trigger SOX’s

whistleblower protections. Strecker was required to report fraud, but she did not. Thus, her SOX claims are also dismissed[10].

## IV.    CONCLUSION

For the foregoing reasons, this Court grants Defendants' Motion to Dismiss Plaintiff's Amended Complaint with Prejudice.

An appropriate order follows.

---

[10] Because Plaintiff failed to meet the protected activity element of her SOX claim, this Court will not address Defendants' statute of limitations argument.